**In re Theresa E. ZIERDEN–LANDMESSER, Debtor.**

**STUDENT LOAN MARKETING ASSOCIATION, Plaintiff,**

**v.**

**Theresa E. ZIERDEN–LANDMESSER, Defendant.**

Bankruptcy No. 5–95–00365.
Adversary No. 5–96–00182A.

United States Bankruptcy Court,
M.D. Pennsylvania,
Wilkes–Barre Division.

Oct. 20, 1997.

5. The Permanent Trustee was represent by his counsel, who also represents him in his capacity as trustee. That lawyer's fees were not accrued for the benefit of the estate and are the Permanent Trustees own responsibility. *See In re JLM,*

*Inc.,* 210 B.R. 19, 24 (2d Cir. BAP 1997) (*citing In re Ames Dep't Stores, Inc.,* 76 F.3d 66, 71–72 (2d Cir.1996)). *See also duPont v. Southern Nat'l Bank,* 575 F.Supp. 849, 864 (S.D.Tex.1983), *aff'd in part, vacated in part,* 771 F.2d 874 (5th Cir. 1985), *cert. denied,* 475 U.S. 1085, 106 S.Ct. 1467, 89 L.Ed.2d 723 (1986) (legal fees paid to counsel "whose efforts are principally directed towards protecting the trustee from an expense which does not benefit the trust ... must be paid by the trustee, without reimbursement from the trust estate").

Steve Bresset, Honesdale, PA, for Debtor/Defendant.

Gregg Feinberg, Allentown, PA, for Plaintiff.

**OPINION AND ORDER** [1]

JOHN J. THOMAS, Bankruptcy Judge.

Both parties have framed the issue as to whether Health Education Assistance Loans ("HEAL") of the Defendant are subject to the unconscionability standard found in 42 U.S.C. § 292f(g) (conditions for discharge of debt in bankruptcy) rendering those loans nondischargeable in the instant bankruptcy. That section in its entirety provides as follows:

g) Conditions for discharge of debt in bankruptcy

A debt which is a loan insured under the authority of this subpart may be released by discharge in bankruptcy under any chapter of Title 11, only if such discharge is granted—

(1) after the expiration of the seven-year period beginning on the first date when repayment of such loan is required, exclusive of any period after such date in which the obligation to pay installments on the loan is suspended,

(2) upon a finding by the Bankruptcy Court that the nondischarge of such debt would be unconscionable, and;

(3) upon the condition that the Secretary shall not have waived the Secretary's rights to apply subsection (f) of this section to the borrower and the discharged debt.

The Defendant has waived the defense concerning the seven-year period found in subsection (g)(1) and neither party has addressed the defense presented in (g)(3). The Court will focus its attention on whether the nondischarge of the debts would be unconscionable as contemplated in subsection (g)(2).

Testimony was taken over two separate days. At the beginning of the second day of testimony the Defendant moved to dismiss the Complaint because the Plaintiff did not establish, through its only witness, how it was assigned the notes evidencing the loans. As such, the Defendant argued that the Plaintiff did not have standing to bring the instant action. Briefs were filed in both support and in opposition to this position.

1. Drafted with the assistance of Richard P. Rogers, Law Clerk.

The Plaintiff makes two main arguments against the Defendant's position. The first is that the Defendant's answer contains no specific and negative averment with respect to the capacity of the Plaintiff to bring this action. In short, Plaintiff argues the capacity issue was waived by the Defendant by not raising it in an answer or in an appropriate pre-trial motion. By raising it as a motion to dismiss after the Plaintiff rested was untimely. Secondly, Plaintiff argues that its witness, Ms. Brenda Arthur, testified as to how the Plaintiff came into possession of the notes and that her testimony was uncontroverted by the Defendant.

■ The Defendant denied the enforceability of the instruments in the Answer to the original Complaint. (See Defendant's Answer to Original Complaint at ¶ 3 filed with the Court on July 11, 1996.) Additionally, when supplementing an offer of proof and requesting whether the notes had to be entered into evidence, the attorney for the Defendant responded as follows:

> Stipulated that the notes attached to the Complaint are indeed the copies of notes purportedly prepared in this transaction. I can't go any further than that, but I can go that far, that they are the notes upon which the Plaintiff is relying. (Transcript of 04/08/97 at p. 23.)

While the reference to the Answer to the Complaint and the Defendant's response as indicated in the transcript above are tenuous, they provide the Court enough to find that the Defendant did not waive the Plaintiff's capacity to sue on the notes.

■ Plaintiff's alternative argument carries much more weight with the Court. Several times during her examination, Ms. Arthur indicated that the Plaintiff had purchased the loans subject to the Complaint. On page 42 of the transcript of April 8, 1997, the witness testified that Plaintiff's Exhibit 5 reflected an account history report which showed the principal amount and accrued interest as of the effective date the Plaintiff purchased the loans from the bank. Furthermore, the witness indicated at page 47 that the loans were purchased and the acquisition department would enter informa-tion received from the banks. On page 58 of the transcript, the witness indicated she knew when the notes would have been physically received. And on page 64, in her response to questioning by the Court, the witness indicated she was trying to explain to the Court the "process assignment". The facts and/or issue surrounding how the Plaintiff came into possession of the notes was broached several times during the testimony. A review of the transcripts indicates that at no time did Defendant cross-examine the witness concerning the purchase of the notes. Even the Defendant advances at page 1 of her Memorandum of Law that the testimony of Ms. Arthur indicates that the notes and right to enforcement were assigned to the Plaintiff from Chase Manhattan Bank and Bank of Indiana National Association. Further, on page 3 of the same Memorandum, the Defendant argues that Plaintiff failed to place into evidence "the slightest thread of evidence as to how the Plaintiff came to be in possession of these instruments with the exception of the uncorroborated testimony of Ms. Brenda L. Arthur ..." What the Court has before it is the oral testimony of a witness employed by the Plaintiff indicating, several times during her testimony, that the notes in question were purchased from two separate banks. This witness was not cross-examined on the history and the testimony was unchallenged, and uncontroverted by the Defendant. Is the oral testimony of the witness the best evidence to prove the standing of the Plaintiff to sue under the terms of the notes in question? Possibly not. But the absence of a timely objection and, taking the testimony of the witness as a whole, allows this Court to make a finding that the Plaintiff had ownership of the notes and had proper standing to sue under those notes.

■ Before proceeding further, a side issue was raised, post-trial, concerning the striking of a Post–Trial Memorandum submitted by the Defendant. The attack on the Post–Trial Memorandum is two-fold. First, it was filed late under the directive of the Court at the end of the trial and secondly, it improperly attempts to open the record in order to submit the affidavit of the Defendant's husband indicating that shortly after

the conclusion of the trial he lost his job and was unemployed. The Court finds that while the submission of the Brief was late under its directive it by no means caused prejudice to the Plaintiff nor was the violation egregious enough to compel this Court to strike the filing of that Brief. Nonetheless, the proper method to open up a closed record to submit additional evidence is by a motion to reopen. Defendant did not follow this procedure and therefore the affidavit will not be considered.

The remaining issue for consideration is whether or not the denial of the discharge of the debts would be unconscionable. Congress did not define the term "unconscionable". This Court will adopt the definition of unconscionable as determined by the Court in the case of *Matthews v. Pineo*, 19 F.3d 121 (3rd Cir.1994) cert. denied, 513 U.S. 820, 115 S.Ct. 82, 130 L.Ed.2d 35 (1994) as that term is used in 42 U.S.C. 254*o*(d)(3)(A) establishing the conditions for discharge in bankruptcy of National Health Service Corps Scholarship obligations. The *Matthews, supra,* defining the term unconscionable, wrote as follows:

> In ordinary usage, the term "unconscionable" means "excessive, exorbitant," "lying outside the limits of what is reasonable or acceptable," "shockingly unfair, harsh, or unjust," or "outrageous." Webster's Third New International Dictionary 2486 (1977). In the absence of contrary indications, we presume that Congress, in employing the term "unconscionable" in Section 254*o*(d)(3)(A), means to adopt this definition. *See Smith v. United States,* 508 U.S. 223, 228–30, 113 S.Ct. 2050, 2054, 124 L.Ed.2d 138 (1993); *Perrin v. United States,* 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979). We note that other bankruptcy courts—and, indeed, the bankruptcy court in this case—have adopted essentially the same definition. *See, e.g., In re Green,* 82 B.R. 955, 959 (Bankr.N.D.Ill.1988); In re Quinn, 102 B.R. 865, 867 (Bankr.M.D.Fla.1989).

■ Further, the *Matthews* Court wrote that: "An option is not 'unconscionable' simply because it may be disruptive, unpleasant, undesirable, or painful. Instead, to be 'unconscionable' an option must be 'shockingly unfair, harsh, or unjust' or 'outrageous', ..."￼ This Court, like the Court in *Rice v. United States,* 78 F.3d 1144 (6th Cir.1996), finds that the standard of "unconscionability" is significantly more stringent than the undue hardship standard for discharge of educational loans under 11 U.S.C. 523(a)(8)(B).

The Court, in considering the dischargeability of the HEAL Loans, finds helpful those factors identified by the *Rice v. United States,* supra, at 1149. The Court wrote that it should be guided by such factors as the "debtors income, earning ability, health, educational background, dependents, age, accumulated wealth, and professional degree". Citing *Barrows,* 182 B.R. 640 (Bankr.D.N.H. 1994); *In re Malloy,* 155 B.R. 940 (E.D.Va. 1993); *United States v. Quinn,* 102 B.R. 865 (Bankr.M.D.Fla.1989). The *Rice* Court also gave consideration to the amount of the debt, the rate of interest that was accruing, the debtor's claimed expenses and current standard of living with a view toward ascertaining whether the debtor had attempted to minimize expenses of himself and his dependents, whether the debtor's current situation is likely to continue or improve, whether the debtor has attempted to maximize his income by seeking or obtaining stable employment commensurate with his educational background and abilities, whether the debtor is capable of supplementing income through secondary part-time or seasonal employment, if the debtor has dependents who can or are able to contribute financially to their own support, and the debtor's previous efforts to repay the HEAL obligation. Concerning this last point the Sixth Circuit indicated that it would look at the debtor's good faith as an appropriate and necessary consideration.

■ With this guidance we now focus on the facts presented to this Court. The record indicates that the Defendant owed approximately Nine Hundred Dollars ($900.00) a month on a One Hundred Thousand Dollar ($100,000.00) loan, at an interest rate of nine percent (9%) over a period of twenty years. The Defendant is a podiatrist. Her loss for her business for 1996 was approximately Three Thousand Dollars ($3,000.00). She testified that for each year that she had practiced podiatry the business had suffered

a loss. In order to generate an income, she works as a night-time cashier at a local supermarket. She has one child and at the time of the hearing her husband was working as a maintenance man at a paper mill. While his employment seemed to be relatively stable there were periods of layoffs. Their gross joint income is Thirty-three Thousand Two Hundred Dollars ($33,200.00) a year. Within weeks prior to the hearing the Defendant's husband was able to acquire a Seven Thousand Dollar ($7,000.00) loan from a credit union to purchase a car as a replacement for the one the Defendant had been driving. No concrete testimony was elicited concerning the amount of the mortgage payment or other household expenses of the Defendant. The Defendant did indicate, however, that should she be forced to make the payments on the school loans she would not be able to make the car payment, mortgage payment and run the household. Nothing in the testimony suggests that the Defendant leads a lavish lifestyle.

The main focus of the testimony centers around the Defendant's choice to continue in her efforts to build a podiatry practice. In that regard, detailed testimony was elicited concerning her attempts to alter her current professional practice by either relocating or seeking a job with other podiatrists. When asked about the likelihood of the Defendant's relocation either of the whole family, or of just her practice into a larger metropolitan areas, the Defendant seemed to find those suggestions futile because it would be either too costly and time consuming to move her practice into another metropolitan area or to sell the house which she estimated would only be at a loss. The Defendant estimated that paying a deficiency on the mortgage after sale of the house, together with rent and other living expenses would simply be financially out of the question. The Defendant indicated that no attempts were made to sell her house and that she was not certain whether or not she would suffer a loss in the sale but was only making that calculation based on another sale that she knew of in her neighborhood. The Defendant did not find the suggestion of her seeking job opportunities in other areas to be appealing because of the cost associated with selling the house and moving her family.

As to the reason why she wanted to continue in her podiatry practice, she indicated that she would hope it would get better and that the patient base would grow in order to make her a profit. She also indicated that while she loved her job, if she wasn't making any money it would not make any sense to continue in that position. When asked if she had determined how her income would be affected if she relocated she wasn't sure whether or not that would make a difference. As far as obtaining jobs in a field unrelated to her profession she indicated that it was difficult because she was repeatedly told that she was overqualified for many of the jobs.

In short, the Defendant's testimony presents a situation in which she continues in a profession in a geographic area in which she has not made a profit in the four years she has practiced and the facts do not indicate that her situation will improve in the near future. While not necessarily expressing a reluctance to relocate her practice and/or her family, the Defendant seemed to find a financial impediment with any suggestion as to relocation of her family and/or her practice into other metropolitan areas. Would repayment of the student loans be difficult for the Defendant and her family? Apparently. Would repayment of the student loans present the Defendant an undue hardship? Possibly. But, as we referenced above, the standard this Defendant must advance is one of unconscionability. This Defendant presents an unwillingness to make some changes in her life, particularly her professional life, in order to get out of the financial predicament she finds herself. Namely, the Court references the continuation of an unprofitable economic enterprise. The Court simply cannot find that requiring the Defendant to take additional steps to either earn more income by relocating her business or by leaving that profession entirely to seek alternative employment is outside the limits of what is reasonable or acceptable, shockingly unfair, harsh or unjust, or outrageous.

For all these reasons the Court finds that the Defendant has not met her burden of advancing evidence that payment of the in-

stant HEAL loans is unconscionable. I find that those loans are nondischargeable in this bankruptcy.